UNITED STATES of America, Appellee,

v.

Cliff CHATELAIN, Defendant–Appellant.

Docket No. 02–1654.

United States Court of Appeals, Second Circuit.

Argued: Dec. 15, 2003.

Decided: Feb. 25, 2004.

---

Thomas Fallati, Assistant United States Attorney, Brooklyn, New York (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Susan Corkery, Assistant United States Attorney, Brooklyn, New York, on the brief), for Appellee.

Norman A. Olch, New York, New York, for Defendant–Appellant.

Before: WALKER, Chief Judge, KEARSE and CABRANES, Circuit Judges.

KEARSE, Circuit Judge.

Defendant Cliff Chatelain ("Chatelain"), who was convicted in 1999 of conspiring to fail to file an accurate currency report, *see* 18 U.S.C. § 371, and was sentenced to, *inter alia*, three months' imprisonment to be followed by a three-year term of supervised release, appeals from an order of the United States District Court for the Eastern District of New York, Carol Bagley Amon, *Judge*, revoking his supervised release on the ground that he violated the conditions of that release by committing a

state crime. For this violation, Chatelain was sentenced to incarceration in a halfway house for a period of four months, to be followed by two years of renewed supervised release. On appeal, Chatelain contends principally that he was denied due process in that he received inadequate notice of the charges against him. Finding no merit in any of his contentions, we affirm.

## I. BACKGROUND

Chatelain commenced his three-year term of supervised release in April 2000 upon completion of his incarceration for the conspiracy offense. One of the conditions of supervised release was that he "shall not commit another federal, state, or local crime." (Judgment of Conviction October 18, 1999, at 3.)

### A. *The Events During Chatelain's Period of Supervised Release*

In January 2002, following a period of marital problems, Chatelain's wife, Denise Chatelain ("Denise"), obtained a family court order of protection against Chatelain. The order required Chatelain, in pertinent part, to "[r]efrain from assault, ... harassment, menacing, ... intimidation, threats or any criminal offense against ... Denise Chatelain." Order of the Family Court, Nassau County, New York, dated January 30, 2002 ("Family Court Protective Order"). In March 2002, Denise complained to local law enforcement officers that, during an argument outside of her home, Chatelain shoved her into a door. As a result, Chatelain was arrested and charged with violating the Family Court Protective Order. Denise also complained to Chatelain's probation officer, Vincent Danielo, a member of the United States Probation Department ("Probation Department").

In April 2002, the Probation Department filed a petition in the district court seeking revocation of Chatelain's supervised release on the ground that Chatelain had violated a "condition[ ] of supervision," to wit: "New criminal conduct, on March 24, 2002, the offender was arrested by the Nassau County Police Dept. for Criminal Contempt in the 1st degree, a class E felony." (Petition for Warrant or Summons for Offender Under Supervision dated April 8, 2002 ("First Revocation Petition" or "First Petition"), at 1.) This petition requested that a summons be issued to Chatelain. A supporting memorandum stated that Chatelain had violated the supervised-release condition that "The defendant shall not commit another federal, state, or local crime." (Memorandum of Probation Officer Vincent Danielo to District Judge Carol Bagley Amon dated April 8, 2002 ("Danielo Memorandum"), at 2.) In an "Evidentiary Support" section, the Danielo Memorandum stated, *inter alia,* that in January 2002, the family court had issued a protective order against Chatelain (*id.*); that on March 23, 2002, Denise complained to Danielo that Chatelain had become enraged and "pushed her after she informed him that the marriage was un-reconcilable" and refused to allow him to enter her home (*id.* at 3); and that, as a result, Chatelain was arrested and "charged with Criminal Contempt in the 1st degree, P.L. 215.51(b), a class E felony" (*id.*).

The end of the First Revocation Petition consisted of a form on which the court could order the issuance of a warrant or a summons, or order other action or no action. On April 12, 2002, the district judge signed that form and ordered the issuance of a summons. The summons was served on Chatelain by Danielo on April 24, 2002. Following court appearances on the First Petition in May and June, the parties agreed in July, with the approval of the

district court, that Chatelain would enter an anger management program and that the government would consider dismissing the supervised-release-violation charge against him. The matter was adjourned to December 2002 to permit Chatelain to complete the program.

In August 2002, in connection with Denise's March 2002 complaint, the Nassau County Criminal Court issued another order of protection. That order, like the Family Court Protective Order, required that Chatelain "[r]efrain from assault, ... harassment, menacing, ... intimidation, threats, or any criminal offense against ... Denise Chatelain." Order of the Criminal Court, Nassau County, New York, dated August 8, 2002 ("Criminal Court Protective Order").

On August 21, 2002, Chatelain and Denise, scheduled to appear in family court for a child-support hearing, arrived at about the same time in that court's parking lot. According to Denise, Chatelain approached her car, and, as she sat inside, he shouted obscenities at her, verbally threatened her, and slammed his hand against the car window as she tried to close it. Denise complained to nearby officers of the Nassau County Sheriff's Department, who arrested Chatelain inside the courthouse.

The Probation Department submitted to a magistrate judge a new supervised-release-revocation petition against Chatelain on August 22, 2002, alleging a new violation of supervised release based on the above incident, and seeking an arrest warrant. It described the "Nature of Noncompliance" as "New Criminal Conduct: Violation of an Order of Protection." (Petition for Warrant or Summons for Offender Under Supervision dated August 22, 2002 ("Second Revocation Petition" or "Second Petition").) An accompanying memorandum to the magistrate judge stated that Chatelain, on leaving family court

on August 21, "confronted his wife and threatened her, resulting in his immediate re-arrest by the Nassau County Sheriff's Department." (Memorandum of United States Probation Officer Dennis M. Stickley to Magistrate Judge Robert Levy dated August 22, 2002 ("First Stickley Memorandum").) The magistrate judge signed the form at the end of the Second Petition and ordered the issuance of a warrant on August 22, 2002. An August 23, 2002 memorandum submitted by the Probation Department to the district judge stated that the Second Petition had been submitted to the magistrate judge on an emergency basis in order to obtain a warrant that could be filed as a detainer to allow federal detention of Chatelain upon his release from state custody. (*See* Memorandum of Probation Officer Dennis M. Stickley to District Judge Carol Bagley Amon dated August 23, 2002 ("Second Stickley Memorandum"), at 1.) This memorandum to the district judge provided greater detail than the memorandum to the magistrate judge as to the parking lot confrontation between Chatelain and Denise, including a description of Denise's complaints that Chatelain had "stated, 'How far do you want to take this, ... you are nothing but a whore' .... 'You don't know, you're messing with your life,'" and had "then slammed his hand into [Denise's] driver side window." (*Id.*) The Second Stickley Memorandum, describing Chatelain's arrest (and, implicitly, the incident itself) as having occurred on August 22, set out the new supervised-release-violation charge against Chatelain as follows:

In violation of the standard condition of supervised release which states, "The defendant shall not commit another federal, state, or local crime" the defendant did commit a New York State crime in violating a court imposed Order of Pro-

tection in violation of New York State Penal Law 215.51(b), a class E felony. (*Id.*)

B. *The Revocation Hearing and the Decision of the District Court*

In October 2002, the district court held a hearing with respect to both the First and Second Petitions. As described below, the hearing began with Assistant United States Attorney ("AUSA") Thomas Fallati's description of the alleged violations, the district judge's reference to the two Probation Department memoranda she had received, and a discussion of the need for production of the state court protective orders.

> MR. FALLATI: Well, the two violations that are charged, your Honor, are that on March 23, 2002 and August 22, 2002, the March incident being Count 1, the August incident being Count 2, the defendant violated the conditions of supervised release, that he not violate state law in that he violated an outstanding order of protection with these two incidents that Ms. Chatelain has reported.
>
> THE COURT: And they're in two different reports; is that right?
>
> MR. FALLATI: Yes, there was an initial report by Mr. Daniello [*sic*].
>
> MR. DANIELLO [*sic*]: Subsequent, your Honor.
>
> MR. FALLATI: And then the supplemental one after the defendant's arrest.
>
> THE COURT: Is this the memo—
>
> MR. DANIELLO [*sic*]: I'm sorry, your Honor, it's not from me because I was on vacation. That might be from a co-worker, the subsequent one.
>
> MR. FALLATI: I have copies here, your Honor.
>
> THE COURT: Is this i[t]?
>
> MR. FALLATI: Yes, that's it.

> THE COURT: So, it's these two are the charges contained in these two documents.
>
> MR. FALLATI: That's correct.

(Revocation Hearing Transcript ("Rev. Tr."), October 8, 2002, at 2–3.)

Chatelain's then-attorney, John D. Patten, urged the court to concern itself not with the background matters that led to the issuance of the protective orders but only with the question of whether those orders had been violated by the March incident or the August incident. He stated:

> I submit what's before your Honor is was there a violation on March 23, was there a violation on August 22 and was there a violation of the order of protections [*sic*] that were applicable in each instance.
>
> . . . .
>
> THE COURT: ... [C]an you stipulate that an order of protection was issued?
>
> MR. PATTEN: Yes.

(*Id.* at 10–11.) When the court stated that it needed to know "the terms of" the protective order (*id.* at 13), Patten reiterated

> we would stipulate that it existed. In fact, there were two orders of protection. We would stipulate that both of them existed.
>
> THE COURT: Well, I will need to see them [so] as to know what their terms were.

(*Id.*)

The government produced the Family Court Protective Order before the witnesses testified. The court asked the AUSA:

> Are you offering into evidence Exhibits 1 and 2 then, the orders of protection?
>
> MR. FALLATI: Yes, ... what I've marked as Exhibit 1 is the order of

protection—the original order of protection.

. . . .

. . . . There was another order of protection that was issued but the first one was still in effect and the second one is just basically the same thing. It just extends—it just has a different starting and ending date.

THE COURT: Well, what's Exhibit 2?

MR. FALLATI: Your Honor, I believe that Exhibit 2 is a second copy of the original order of protection. I erred in this.

. . . .

THE COURT: Don't we need th[e second order of protection]?

MR. PATTEN: I think you do.

MR. FALLATI: . . . .

. . . .

The second order of protection is just duplicative except it just has—it's issued by the criminal court and it—because it's issued in June rather than January, it runs for a longer period of time than this one. But the acts fall within the scope of the first order of protection.

THE COURT: Well, maybe you want to see if you can get your hands on the other one, too.

MR. FALLATI: Okay.

(Rev. Tr. 28–30.)

Before the end of the hearing, the government obtained a copy of the Criminal Court Protective Order as well:

MR. FALLATI: . . . . [W]e now have the second order of protection . . . that we discussed this morning. It's unmarked [sic] as an exhibit. This is the August order, which is the one issued by the criminal court.

(*Id.* at 232.)

At the hearing, the court heard testimony principally from Denise, Shaneda Didder, who was a witness to the March incident, Chatelain, and Chatelain's cousin Herve Cuvier, who was a witness to the August incident. Denise testified that on March 23, she had an argument with Chatelain outside her home and that Chatelain came through the gate, still arguing, and then pushed her against the screen door. (*See id.* at 37–38.) Didder testified that she had seen Chatelain push Denise against the screen door. (*See id.* at 92.) In contrast, Chatelain testified that he did not push Denise at all (*see id.* at 159); he testified that when he walked past her to enter the house for a drink of water, "she jumped back and she hit herself on the screen door" (*id.* at 158).

As to the August incident in the family court parking lot, Denise testified that Chatelain had

walked over to the car and he said to me, "How far do you want to take this?"

He called me "F" whore. He said, "What do you want $1,200 a month? You don't realize you're messing with your life."

And I started to roll the window up and he started slamming his hand on the window and he said something about, "You don't know who the 'F' you're messing with."

(Rev. Tr. 42.) In contrast, both Chatelain and Cuvier testified that Chatelain had not approached Denise's car, that Chatelain and Denise had conversed from a distance of 20 or 30 feet, and that after a brief verbal exchange Chatelain simply walked away. (*See id.* at 129–31, 171–72.)

As to the nature of the state charges against Chatelain, the government stated

at the outset of the hearing that the charge of criminal contempt resulting from the March incident had been conditionally resolved by Chatelain's entry of a plea of guilty to disorderly conduct in violation of New York Penal Law § 240.20(7) and was subject to reopening by the district attorney. (*See id.* at 4–5.) Chatelain took the position that disorderly conduct is "a violation not a conviction of a crime" and that, in the March incident, Chatelain thus had not violated the pertinent supervised-release condition. (*Id.* at 7.) The court stated the view, endorsed by Danielo, that in order to violate the supervised-release condition, a defendant need not have been convicted if the district court found that he had "committed" the alleged crime. (*Id.* at 22.)

During summations, the court inquired whether, if it "credit[ed] Ms. Chatelain's account" and found Chatelain to have engaged in the conduct alleged, violations of the protective orders would be established. (Rev. Tr. 264.) Defense counsel conceded that they would be established:

MR. PATTEN: If on the March 23 there's a deliberate intentional pushing of her, then it rises to the level of a violation of the order of protection by harassment. . . .

THE COURT: And harassment, banging on the window and yelling would presumably be harassment, as well; correct?

MR. PATTEN: Well, that would be harassment and a threat, too; yes.

(*Id.* at 264–65.) Patten argued, however, that the March incident should not be considered a violation because any pushing was unintentional and that the August incident "did not happen." (*Id.* at 265.)

The district court announced its decision on the record on October 18, 2002. (*See* Transcript of Proceedings, October 18, 2002 ("Decision Tr.").) The court noted that

[t]here were two charges, two specifications, one involving an incident where the defendant's wife, Denise Chatelain, contended that on March 24 [*sic*] of 2002, that he, in connection with an argument, pushed her against the screen door of her home. There was a separate incident alleged, that on August 22 of this year, there was an incident outside of the Family Court in which Ms. Chatelain alleged the defendant approached her car and threatened and harassed her, in words or substance, how far do you want to take this. She contends he used the word "you f'ing whore, you don't realize who you are messing with" and slammed his hand against the window. Those are the two specifications.

(Decision Tr. 2.) The court also noted that as counsel effectively conceded this is . . . a matter of resolving credibility because if Ms. Chatelain's version of the events were credited, there is no question that the activities that she described by the defendant would in fact constitute violations of the protective order.

(*Id.* at 2–3.)

The court stated that it found the testimony of Denise and Didder credible and the testimony of Chatelain and Cuvier not credible, explaining those assessments in detail (*see id.* at 4–7), and it concluded that Chatelain had thus "violated the terms of his supervised release by violating the Order of Protection in the two specific ways that the government has charged" (*id.* at 8). The court ordered that Chatelain's supervised release be revoked, and it sentenced him to four months' imprisonment in a halfway house, to be followed by two years of renewed supervised release. *See* Violation of Supervised Release Order dated October 25, 2002.

## II. DISCUSSION

On appeal, Chatelain contends principally that the order revoking his supervised release should be reversed because he was denied due process, in that (a) he was not given adequate notice of the supervised-release-violation charges against him; (b) the district court docket sheets do not indicate that any written charges were ever filed; (c) he was left to speculate what state crime he was alleged to have committed while on supervised release; and (d) the state court protective orders were never admitted in evidence at the hearing, and hence "the record does not show the terms of the orders ... purportedly violated" (Chatelain brief on appeal at 9; *see also id.* at 15 ("their precise terms were never disclosed"); *id.* at 14 ("the terms of the orders are unknown"); Chatelain reply brief at 6 (same)). Chatelain also argues "that the conduct the judge identified in her decision as constituting a crime is not a crime under the law of the State of New York" (Chatelain brief on appeal at 1), and that the August incident was merely an "emotional use of profane language [that was] protected by the First Amendment" and thus could not properly be found to constitute a violation of an order of protection or a crime (*id.* at 18). We find no basis for reversal.

### A. *The Due Process Arguments*

■ Due process requires, *inter alia,* that a defendant charged with violating a condition of supervised release be afforded notice of the charges against him before the court may revoke his supervised release. *See, e.g., United States v. Jones* 299 F.3d 103, 109 (2d Cir.2002) ("constitutional guarantees governing revocation of supervised release are identical to those applicable to revocation of parole or probation");

*United States v. Sanchez,* 225 F.3d 172, 175 (2d Cir.2000) (same); *cf. Gagnon v. Scarpelli,* 411 U.S. 778, 782, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (due process requires adequate notice in a proceeding to revoke probation); *Morrissey v. Brewer,* 408 U.S. 471, 488–89, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (parolee faced with revocation of parole must be afforded notice and fair opportunity to be heard). *See also* Fed.R.Crim.P. 32.1(b)(2)(A) (requiring "written notice of the alleged [supervised release] violation"). The notice must be sufficient to allow the releasee to prepare to defend against the charges. We would regard a petition asserting a violation of the supervised release requirement that the releasee not commit any new crime as providing adequate notice in accordance with Fed.R.Crim.P. 32.1(b)(2)(A) and the Constitution if it identifies the no-further-crime condition as the condition allegedly violated, identifies the crime allegedly committed, and contains a description of the basic facts underlying the new criminal charge, including the approximate dates of the events, the location at which they occurred, and the individuals involved. *Accord United States v. Havier,* 155 F.3d 1090, 1093 (9th Cir.1998); *United States v. Kirtley,* 5 F.3d 1110, 1113 (7th Cir.1993); *United States v. Tham,* 884 F.2d 1262, 1265 (9th Cir.1989).

■ Preliminarily, we note that the record of the proceedings below leaves something to be desired. The district court docket sheet lacks an entry mentioning either Petition; there is no docket entry indicating that the memoranda supporting the Petitions were filed; and while Danielo filed an attestation that he served the April 2002 summons on Chatelain, that document did not indicate that either the First Petition or the supporting memoran-

dum was also served. We note that the U.S. Probation Office, a unit of the District Court, plays a significant role in proceedings to revoke supervised release: The Probation Office learns of a possible violation of supervised release, determines whether to seek a revocation of supervised release, prepares the necessary documentation to initiate revocation proceedings, and submits the documents to the district court. It has apparently not been the policy of the Probation Office in the Eastern District of New York to docket the petitions. We urge the Probation Office of that District, and of all other Districts within this circuit, to take special note of these significant clerical responsibilities that are borne by the Probation Office in the first instance. We also think it advisable, in the interests of justice, that the U.S. Attorney's Office, given its involvement and the formal legal training of its Assistants, undertake the filing of such petitions and their supporting documents in aid of future appellate review. Additionally, we note that the revocation hearing transcript in this case does not show any ruling by the court formally receiving either protective order into evidence, although both orders were produced and marked for identification. We think it highly advisable, despite the relative informality of such proceedings, that the government should ensure that the material that the Probation Office and/or the government proffers as evidence is actually entered into evidence.

Nonetheless, the record adequately indicates that Chatelain received written notice of the details of the charges against him and that he and the court had explicit knowledge of the relevant terms of the protective orders. The written Petitions, while not mentioned in haec verba in the court's docket entries, plainly were filed with the court. The court's April order that a summons be issued to Chatelain and its August order that a warrant be issued for his arrest were entered on the court's docket; and those orders were inscribed on the Petition forms themselves. Thus, the Petitions plainly were filed in the district court despite the failure of the docket entries to list them, separately, as "petition[s]."

Although Chatelain argues that the Petitions contained insufficient detail to give him adequate notice, ample detail was included in the Danielo Memorandum in support of the First Petition and the Second Stickley Memorandum in support of the Second Petition; and although the record does not reveal whether the memoranda were served on Chatelain simultaneously with service of the summons and the warrant, it is inferable from the record of the proceedings that Chatelain had been given copies of those memoranda prior to the revocation hearing. It is clear that the memoranda had been submitted to the district judge. At the start of the revocation hearing, the court referred to those documents as containing the charges against Chatelain (see Rev. Tr. 2–3), and it used the term "memo" and "report[ ]" interchangeably (id. at 3). Chatelain's attorney made no objection on the ground that the memoranda had not been served on the defense prior to that hearing, or that Chatelain did not know their contents, or that he had any uncertainty as to the specifics of the supervised-release-violation charges against him. And the absence of any such objection is hardly surprising, given that by the time of this revocation hearing, according to the district court docket sheets, the parties had already appeared before the district court with respect to the First Petition three times. We conclude that it may safely be inferred from the fact that there were such prior proceedings, and from the fact that Chatelain's attorney did not suggest that there had been any failure to serve the memoranda, did not inquire what the court meant by "report[ ]" or "memo," and did not exhibit any uncertainty whatever as to what documents the court was referring to, that the defense had in fact received copies of the memoranda in advance of the revocation hearing.

It is also clear that the Danielo and Second Stickley Memoranda gave express notice of both the conduct that the government contended violated the terms of supervised release and the provision of state law that Chatelain was alleged to have violated. As described in Part I.A. above, the specific acts that Chatelain was alleged to have performed were detailed in the memoranda. Chatelain plainly was prepared to defend against those allegations at the hearing. He testified with respect to both the March and the August incidents, and he brought his cousin to testify in his behalf with respect to the August incident.

As to what state-law provision was involved, the Danielo Memorandum with respect to the March 2002 incident stated that Chatelain had been "charged with Criminal Contempt in the 1st degree, P.L. 215.51(b), a class E felony." The Second Stickley memorandum with respect to the August 2002 incident likewise specified the charge that "the defendant did commit a New York State crime in violating a court imposed Order of Protection in violation of New York State Penal Law 215.51(b), a class E felony." Both memoranda stated that in January 2002 Denise had obtained a protective order against Chatelain. The New York statute cited in the memoranda provides:

A person is guilty of criminal contempt in the first degree when:

. . . .

(b) in violation of a duly served order of protection . . ., he or she:

(i) intentionally places or attempts to place a person for whose protection such order was issued in reasonable fear of physical injury . . . by means of a threat or threats; or

. . . .

(v) with intent to harass, annoy, threaten or alarm a person for whose protection such order was issued, . . . shoves, . . . or otherwise subjects such other person to physical contact or attempts or threatens to do the same . . . .

N.Y. Penal Law § 215.51(b)(i) and (v). Given the citation of § 215.51(b) in the memoranda, along with the memoranda's detailed descriptions of Denise's complaints that Chatelain had pushed her in March and had threatened and harassed her in August, we conclude that the Petitions and the supporting memoranda gave Chatelain ample written notice of the conduct that the government contended violated the conditions of his supervised release.

Finally, the record shows that Chatelain's contention that in these revocation proceedings the terms of the protective orders were "unknown" (e.g., Chatelain brief on appeal at 1, 14, 17, 18) is meritless. As discussed in Part I.B. above, the court stated at the outset of the revocation hearing that it needed to see the terms of the protective orders; and when the government initially produced only the Family Court Protective Order, the court directed the AUSA to get a copy of the Criminal Court Protective Order. The AUSA complied and so informed the court; copies of the FamilyCourt Protective Order and the Criminal Court Protective Order were marked for identification as Government Exhibits 1 and 3, respectively. Although the revocation hearing transcript does not reflect that the protective orders were ever formally admitted in evidence, it is clear from the court's explanation of its ruling that the court had the protective orders before it and made its ruling on the basis of their precise terms. For example, the court stated that it was not concerned with the "less serious" provisions of those orders (Decision Tr. 5) that dealt with such matters as whether Chatelain could be in Denise's house unless another person was present (see id. at 3, 4–5) but rather was concerned only with "whether the defendant committed the more serious violations of this protective order" (id. at 3). The court had earlier observed that Denise's testimony, if credited, meant that Chatelain's pushing Denise, yelling at her, and banging on her car window would show that Chatelain violated the protective orders' prohibition against "harassment."

(*See* Rev. Tr. 264–65.) Plainly, Chatelain's contention that the terms of the protective orders were unknown to the court is meritless. And his contention that the pertinent terms of the protective orders were unknown to the defense is frivolous, given his attorney's summation quoting those prohibitions verbatim:

> MR. PATTEN: ....
>
> Judge, may it please the Court, orders of protection in subdivision 2 directs [*sic*] that Mr. Chatelain refrain from assault, stalking, harassment, menacing, reckless endangerment, disorderly conduct[,] intimidation, threats or any other criminal offense that—against one, Denise Chatelain, wherever she may be.

(Rev. Tr. 249–50.)

In another case, the defense may not so clearly reveal that the defendant has received adequate notice, and we urge the government to make a better effort in future supervised-release-revocation proceedings to ensure that the district court record is explicit as to what notice was given to the defendant and to ensure that the record reflects that any documents necessary to the court's decision either have been admitted in evidence or have properly been the subject of judicial notice, *see generally* Fed.R.Evid. 201; *Garner v. Louisiana,* 368 U.S. 157, 173, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961). In the present case, however, the record shows clearly that Chatelain had notice of the relevant terms of the protective orders and is sufficient to warrant the inference that the government gave him notice of the supervised-release condition he allegedly violated, of his precise acts that were alleged to have violated the protective orders, and of the state-law criminal statute thereby violated. We conclude that there was no error that affected Chatelain's substantial rights or seriously affected the fairness, integrity, or public reputation of the revocation proceedings.

B. *Other Contentions*

Chatelain also contends, *inter alia,* that his supervised release could not properly be revoked on the basis of the government's charge that he committed a "crime" while on supervised release because (a) although he was charged with criminal contempt in connection with the March incident, a felony, he pleaded guilty only to disorderly conduct, which is not defined by state-law as a "crime"; and (b) in the August incident he was merely engaging in constitutionally protected speech. These contentions lack merit and do not warrant extended discussion.

■ Chatelain contends that his March 2002 conduct did not violate the supervised-release conditions because "[d]isorderly conduct," to which Chatelain pleaded guilty, is defined only as "a violation," N.Y. Penal Law § 240.20, whereas, as used in the New York Penal Law, " '[c]rime' means a misdemeanor or a felony," N.Y. Penal Law § 10.00(6), and does not include a mere violation, *see id.* § 10.00(3). These definitions provide no basis for reversal. The pertinent supervised-release condition provided that Chatelain "shall not *commit* another federal, state, or local crime." (Judgment of Conviction October 18, 1999, at 3 (emphasis added).) As the district court noted at the revocation hearing—without dissent from Chatelain's attorney—the applicability of this condition is not dependent on the defendant's being convicted, so long as the court in the revocation proceeding finds that the defendant "committed" such a crime (Rev. Tr. 22). *See generally* 18 U.S.C. § 3583(e)(3) (a finding of violation of a supervised-release condition need only be made "by a preponderance of the evidence"); *United States v. Meeks,* 25 F.3d 1117, 1123 (2d Cir.1994) (same). The district court here accepted the testimony of Denise and Didder as credible and found that Chatelain pushed Denise in the March incident and that he threatened and harassed her in the August incident, thereby violating the express prohibitions of the protective orders. Those actions were plainly within the scope of the

criminal contempt section cited by the government, N.Y. Penal Law § 215.51(b), as quoted in part II.A. above. The district court did not err in concluding that Chatelain had twice committed a state crime, thereby "violat[ing] the terms of his supervised release by violating the Order of Protection in the two specific ways that the government has charged." (Decision Tr. 8).

■ Nor is there any merit in Chatelain's claim that the August incident could not provide a basis for revocation of his supervised release because his conduct was speech protected by the First Amendment. Threats, whether explicit or implicit, are not protected speech. *See, e.g., Chaplinsky v. New Hampshire*, 315 U.S. 568, 573, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); *Mozzochi v. Borden*, 959 F.2d 1174, 1178 (2d Cir.1992); *People v. Dietze*, 75 N.Y.2d 47, 52–54, 550 N.Y.S.2d 595, 598–99, 549 N.E.2d 1166 (1989). Chatelain's counsel conceded at the revocation hearing that "banging on the window and yelling" would constitute "harassment and a threat, too." (Rev. Tr. 265.)

## CONCLUSION

We have considered all of Chatelain's contentions on this appeal and have found them to be without merit. The order of the district court is affirmed.